A bill was filed in the year 1847, in the court of Equity of Wake County, by the plaintiff in this suit, and his two brothers, *Page 153 
Charles Graham and Hamilton C. Graham, against Thomas P. Little, executor of William P. Little, and of Mrs. Anne Little, widow of the said Wm. P., Charles E. Skinner, who had married a daughter of said Wm. P., and others, the object of which bill was to ascertain judicially what was due and owing to the plaintiffs in that suit from the estate of Wm. P. Little, who was their maternal grandfather, their mother, the daughter of Wm. P. Little, and Mrs. Anne Little, then being dead; which suit, when properly constituted, was set down for hearing, and sent from the said court of Equity of Wake County, to the Supreme Court. At December Term, 1851, of this Court, a report was made of the administration of the assets and the state of the claims of the various legatees under the will of Wm. P. Little, and there being no exception to this report, a decree was passed, commanding, among other things, that Thomas P. Little, as executor of Wm. P. Little, should pay to the use of the plaintiff and his said brothers, Charles and Hamilton, the sum of $2,922,28, with interest from the 11th of January, 1851. By the same decree it was ascertained that the executor of Wm. P. Little was indebted to George Little, another son of Wm. P. Little, in the sum of $2,995,03; to Mrs. Mary Mosely, a daughter of the same parents, in the sum of $2,345,03; to Charles E. Skinner, husband of Susan Skinner, another daughter of the same, $2,052,53; to William Little, jr., in the sum of $2,540,03; to Edward Tarry, husband of Lucy, another daughter, in the sum of $4,093,02.
The controversy in this case (see 5 Ire. Eq. 407,) turned materially upon the will of Wm. P. Little, which was as follows: "In the first place, I give to my wife, Anne, all the negroes which came by her, and all their past as well as future increase. Secondly, I lend to my wife, during her natural life, all the residue of my estate, real and personal. Thirdly, at the death of my wife, I give to all my children, who may be then living, an equal part of the residue of my estate, both real and personal, and in case any of them die previously, leaving issue, I wish said issue to have the portion which their parents would have drawn if living, due regard being had to such as may *Page 154 
have received any advances either from me or their mother, at any time previous to her death, out of my estate." He appointed his wife, Mrs. Anne Little, the defendant, Thomas P. Little, and George Little, his executors,with full power to sell any part of his estate, either real or personal,without any order or decree of any court.
The said executors sold a large real estate for the payment of debts, and the question was, whether the executors had a right to do so before the personal estate was first exhausted, and the court decided that they had not, but that the personal estate was the primary fund for the payment of debts, and that the real estate having been improperly sold for that purpose, the personal property, including the legacy of Mrs. Little, should be substituted for the land, and that its proceeds should be distributed in the same way as the land would have been had it not been sold. This decision materially augmented the share recovered by the plaintiff and his brothers.
Sometime in the year 1854, E. G. Haywood, Esq., having been appointed guardian of the plaintiff, Edward Graham, and his brothers, caused an execution to be issued against the said Thomas P. Little, for the amount decreed his wards, and on the 12th of September, 1854, the sum of $1,202,23 was paid by the said executor to the said Haywood as guardian.
The plaintiff alleges, in his bill, that about March, 1853, he went on a visit to his aunt Mrs. Susan Skinner and her husband Dr. Skinner; that he was at that time an infant of about nineteen years old without parents, and that he remained mostly in the family of Dr. Skinner until about the time of his arrival at age, on the 24th October, 1854, and during that time considered that as his home; that while so residing at the house of Dr. Skinner, he frequently represented to this plaintiff that the recovery which he and his brothers had obtained against their uncle Thomas P. Little, was unjust and iniquitous, and ought never to be collected, and that in this representation, Thomas P. Little, from time to time, concurred, although he (plaintiff) could never understand why the said recovery was unjust and iniquitous. The plaintiff further *Page 155 
alleges, that he was young and utterly ignorant of matters of business, and had the fullest confidence in his uncle T. P. Little, and Doctor Skinner, who was also his uncle by marriage, and he gave into the belief that this recovery, for some reason that he did not understand, ought not to be collected. He alleges that the said Skinner very frequently referred to this subject, and made many statements and representations to convince him that the executor, Thomas P. Little, had been greatly wronged by the decree that had been made against him in the Supreme Court, in favor of the plaintiff and his brothers; among other things, he mentioned certain claims for the boarding of plaintiff's father and mother after their marriage, and like claims for the boarding of their children, which ought to have been deducted from the amount of said decree, and certain large debts which he, as executor, had paid for the estate of William P. Little, which were unjustly excluded from his credits; that he, the said Skinner, never intended to take any part of the recovery in his favor, from the said estate of T. P. Little, and had released, or would release, the same, and that he believed all the other legatees of his father-in-law intended to do the same, or had done so. He alleges further, in his bill, that the said Thomas P. Little, although he did not often speak of the matter to the plaintiff, yet, when he did so, always referred to Doctor Skinner as being intimately acquainted with the circumstances, and referred plaintiff to him for information concerning them. He always, however, asserted, as of his own knowledge, that the debt was unjust and ought not to be paid.
The plaintiff, in his bill, further alleges, that about this time he was a good deal dissipated and addicted to the use of spirituous liquor, and that from this cause he was often in a nervous and suffering condition; that about the same time he applied to the defendant, T. P. Little, for his share of the recovery above spoken of, and proposed to him if he would advance to him that amount he would take it as a loan, and although he was not of age, he would give his note for the same, and would return it when he arrived at full age; that *Page 156 
his uncle, the said T. P. Little, assented to this proposition, but failed to comply with it by advancing to him the money; that this was in the year 1854, some short time before the payment made to E. G. Haywood, in September of that year.
The plaintiff further alleges, that he arrived at full age on 24th of October, 1854, while still residing in the family of Dr. Charles Skinner, and that a few days after arriving at age, it was proposed by either Dr. Skinner or his uncle Thomas, who was present, that he should sign a note to refund the $1200 collected by Mr. Haywood; that the same arguments, as before stated, were again urged upon him, and he was reminded of his willingness to sign a note before he was of age; that Dr. Skinner was again prominent in thus urging him, but that the defendant, T. P. Little, was present, assenting to his assertions; that plaintiff had never examined the proceedings in. Equity of which his uncles complained, and was totally ignorant of the grounds upon which the decree was made; that his guardian was absent, and he had no opportunity of getting the advice of counsel; that he was greatly attached to his uncle Thomas P. Little as well as to Dr. Skinner, his uncle by marriage, and had great confidence in their knowledge of business and fair dealing, and though extremely reluctant, he gave his note to the said Thomas P. Little for $1200, payable twelve months after date; that very shortly after these events the plaintiff came to Raleigh and informed his guardian, E. G. Haywood, of what had been done, and his reasons for entering into the note, when, for the first time, he was informed of the true nature of his claim, and became aware of the total illusion under which he had acted. He then gave notice, both to Thomas P. Little and Charles Skinner, that he should resist the payment of this note, and his then guardian, Mr. Haywood, informed them to the same effect.
Dr. Charles Skinner, in his answer, admits that he had an intimate knowledge of the affairs of the estate; that he was advised by counsel learned in the law, and never doubted that it was the purpose of the will of W. P. Little to secure, *Page 157 
if possible, the specific legacy to the widow, and throw the payment of the debts on any and every other portion of the estate.
Entertaining this opinion very firmly, and knowing that it had been adopted and acted on up to the death of the widow, by the consent of the children who were of age, he was unwilling, and had so declared to the rest of the family, to avail himself of any advantage, which a different interpretation might give; that he is satisfied, if William P. Little's estate had been divided on the basis laid down in the decision of the Supreme Court, the amount of the testator's indebtedness would have exhausted all the personal property, and so far consumed the real estate as to have left a scanty provision for the widow; and he thinks it fortunate for all that the executors adopted and acted upon the construction which they did.
He says that, in 1853, the plaintiff became an inmate of the defendant's house; that both the defendant and this wife entertained the kindest feeling, and every proper sentiment of affection which attaches to the relation between them. In reply to some remarks made by the defendant, complaining of his uncle T. P. Little, for not paying him and his brothers the amount of the decree, he thinks, in February, 1854, he did say to the plaintiff, that, in his opinion, the debt, though a legal one, was unjust; that he then gave the plaintiff an explanation of the whole matter, and said that he did not mean to profit by the decree, and he did not believe any of the other children would; that admitting the decree to be just as well as legal, as to all the children of Mr. Little, there were reasons why the plaintiff and his brothers should be both lenient and liberal towards the defendant in finally adjusting the matter, namely, that while all the other children of Mr. Little had accounted for their board while they remained with Mrs. Little, neither the plaintiff's mother, nor her husband, nor children, after the marriage of their mother, had accounted for any thing; that if such a charge had been allowed against them, the plaintiff and his brothers would have fallen in debt to the estate; that at the close of this conversation the plaintiff *Page 158 
remarked, if these things were so, he would certainly repay his uncle his share of the debt on coming of age, and would advise his brothers to do the same; that if his uncle should pay the decree he would regard it as a loan, and would give him bond, with security, for its re-payment.
He further states, in his answer, that in no great while after the conversation above stated, he mentioned to the defendant Little the promise which the plaintiff had made in relation to refunding his share of the decree, when they both concluded that all offers of this kind should be postponed until plaintiff arrived at full age; that early in the fall of 1854, the plaintiff had been to Raleigh, and on his return referred to the matter and said, his guardian, Mr. Haywood, had informed him that what he (defendant) had said about the matter was not so, and was contradicted by the records of the Supreme Court, and that the other parties had not released; to which this defendant replied, in substance, that it was not true that his statement was contradicted by the records of the Supreme Court, for that he had seen the bill, the answers of the executor, and of some of the members of the family, the accounts rendered and the decision of the court, and that none of these contradicted what he had stated; that the record could not contradict him unless it stated what did not belong to it; that he had not said the other children had released, but that they had settled with the executor, and the whole amount had been regarded in that settlement as released, and was so, practically. In this conversation, this defendant again explained to the plaintiff, as fully as he could, the circumstances attending the case — the construction which the family had put upon the will of Mr. Little — the construction which the Supreme Court had put on it — the manner in which the estate had been administered — how the land had been sold to pay debts, instead of slaves — how the children had lived with the widow, and how the plaintiff's family had lived there, and which of them had accounted and which had not, and this defendant left nothing unsaid which was calculated to affect the plaintiff's conclusion on the subject, and doing this, he *Page 159 
was actuated with no other feeling than an impartial sense of justice; and it seemed to this defendant, at the end of this conversation, that the plaintiff was satisfied in regard to the facts of the case, and was inclined to execute his original purpose as avowed to this defendant before. He had no further conversation with the plaintiff upon the subject of the decree and the settlement, until the day on which the note was executed. On that occasion, both the plaintiff and defendant Little were at defendant's house, the plaintiff being then of full age; this defendant admits, in his answer, that he did introduce the subject by enquiring of him if he had made up his mind to repay his uncle Little the amount received on the decree, saying, that if he had it might be arranged then. The plaintiff hesitated for a moment, as if he were not prepared to answer, and remarked, that it was a hard case for his uncle to pay the money, and he would be willing to give up his share if he knew his brothers would do so when they came of age, and if they should not follow his example, they would receive just that amount more than himself; that immediately after making this remark, the plaintiff, as if convinced it was unjust to regulate his conduct by such a standard, said he did intend to repay his uncle the whole sum, but he was unwilling to give his note, for that his uncle was embarrassed for money, and he was afraid he would be pushed for the money if he gave a note, but said, if the note was made payable twelve months after date, and transferred to this defendant, who could, and he believed would, indulge him, he would execute it, and said at the same time, that he relied on the good offices of this defendant to get him into some profitable business whereby he could pay off the note without impairing his estate. That they both went into a small house where the defendant Little lodged, and then the whole proposal of the plaintiff was mentioned to the defendant Little, who assented to the terms and the note was executed.
That in accordance with this arrangement, this defendant took the note by a transfer to him from the defendant Little, and, the latter being indebted to him, gave him a credit for *Page 160 
the amount; but understanding by a letter from the late guardian of the plaintiff, Mr. Haywood, that the plaintiff was dissatisfied, and that he intended to controvert the note given, being loth to be involved in a law-suit, he surrendered the note to Mr. Little, and since then has not considered himself as having any interest in it.
That at these several interviews, and at the time and occasion of executing the note in question, he does not believe the plaintiff was at all under the influence of spirituous liquor; that this defendant never attempted to acquire any influence over the plaintiff for the purpose of effecting this arrangement, and what he did in the matter was for no benefit to himself.
The answer of the defendant Little, refers to Dr. Skinner's, and is substantially the same in its history of the transaction. Motion to dissolve the injunction. Motion refused. Appeal to the Supreme Court.
The bill is filed to enjoin the defendants from collecting a bond executed by the plaintiff, to Thomas P. Little, under the following circumstances: W. P. Little, sr. [Sr.], died in the year 1827, greatly indebted, and possessed of a large real and personal estate. The last clause in his will is as follows: After appointing his sons, Thomas P. and George Little, and his wife, Mrs. Anne Little, his executors and executrix, they "are hereby vested with full and ample power to sell any part of my estate, real or personal, whenever they may think proper to do so, c." Under this power, the executors and executrix, acting by the advice of counsel, sold the land which the testator owned in Tennessee, and some in this State, believing that, as negroes were low in value in this State, and the lands were held at high prices in Tennessee, it was the best course to pursue to pay the debts of the estate. Subsequently, a bill was filed by the legatees of W. P. Little, of *Page 161 
whom the plaintiff was one, for a settlement of the estate, and an account of the disbursement of the assets by the executors. In that case the court declare that the land was not charged in the will in exoneration of the personalty, but that the latter was the primary fund for the payment of the testator's debts, and decreed an account. A reference was made to the clerk to take the accounts and he reported that the defendants owed the plaintiff and his brothers on the 11th of January, 1851, $2,922,78. This report was confirmed, and a decree rendered in accordance thereto. This decree is still in force, unreversed. Of the sum so decreed, the defendant Thomas P. Little paid to Mr. Haywood, the guardian of the plaintiff, $1,200. The plaintiff was then a minor. A year or two before he come of age, he went to the house of the defendant Dr. Skinner, who had married his aunt, which he made his residence. Dr. Skinner was of the opinion that the legatees had all been equally benefitted by the sale of the land instead of the slaves. In February, 1854, while the plaintiff was at his house, finding, as he says in his answer, that he indulged in unkind feelings towards his uncle T. P. Little, on account of his delay in paying the decree, he (Skinner) determined to give him a full explanation of the whole business, and told him he did not regard the decree against his uncle T. P. Little as just; that he did not intend to profit by it, and he did not believe any of the other children would, and that there were reasons why the plaintiff and his brothers should be liberal as well as lenient towards Thomas P. Little — namely, that while all the other children of W. P. Little had accounted for their board, c., while they remained with their mother, Mrs. Little, neither plaintiff's mother, nor his father, nor their children, had accounted for any thing; and if they had so accounted, they would have been largely in her debt, and he believed all the other legatees had executed their releases. The plaintiff observed if these things were so, if his uncle paid the decree, he would consider it as a loan, and give his bond to refund when he came of age.
In a subsequent conversation, after the plaintiff had been to *Page 162 
Raleigh, he said to Dr. Skinner, he had had a conversation with his guardian, E. G. Haywood, who informed him that what he, Skinner, told him, was not so, and was contradicted by the record of the Supreme Court, and that the other parties had not released. This statement the defendant Skinner denied, and then repeated over to the plaintiff what he had said in the previous conversation. At this time, the defendant Little was at the house of Dr. Skinner, and the latter thought the plaintiff was satisfied, and introduced the subject again by inquiring of him if he had made up his mind to repay to his uncle Little the amount received on the decree, "saying that if he had, it might be arranged then." The plaintiff hesitated for a moment as if he were not prepared to answer, and then remarked it was a hard case for his uncle to pay the money, and he would be willing to give up his share if he knew his brothers would do so when they came of age, but it was uncertain what they would do then. Finally, after some reflection, he said he did intend to repay his uncle, and he would execute his note for his share of the decree, and the note was executed, Little being present. After its delivery, the defendant Skinner took the note from T. P. Little, with an endorsement in blank, and gave him credit for the amount. This is the statement taken from the answers of Dr. Skinner and T. P. Little.
The question is, will a Court of Equity suffer an obligation, executed under such circumstances, to be enforced against the plaintiff?
It is admitted that a voluntary bond is as binding between the parties in a Court of Equity as in a Court of Law. This is emphatically a voluntary bond, there being no consideration. Will the court suffer it to be enforced under the peculiar circumstances of the transaction? A nephew is induced by one uncle, with whom he was residing at the time, to make a donation to another uncle, of a bond for a large sum of money. The plaintiff was a young man just emerging out of his minority, unacquainted with business, ignorant of the facts of the case, addicted to the too free use of spirituous liquors, in the *Page 163 
house with his two uncles, T. P. Little and Dr. Skinner, urged by the latter to execute a bond to the former for a large sum of money, when, at that moment, it is very clear that the uncle T. P. Little was indebted to the nephew in a much larger sum.
The case bears a strong analogy to the class of cases in which trustees and others, acting in a fiduciary character, are forbidden to contract with their cestuis que trust. But it properly belongs to another class mentioned by Mr. Adams, P. 184, where there is no technical fiduciary relation existing between the parties, but one stands in the relation of special confidence towards the other, so as to acquire an habitual influence over him, where he cannot accept from him a personal benefit without exposing himself to the risk, proportioned to the nature of their connexion, of having it set aside as unduly obtained. Even where the only relation is that of friendly and habitual reliance on advice and assistance, care must be taken that no undue advantage shall be obtained; Hunter v. Atkins, 3 M. and K., 113; Dent v. Bennet, 4 M. and C., 269. The proper jurisdiction of a court of Equity is to take every one's act according to conscience, and not to suffer undue advantage to be taken of the strict forms of law, or of positive rules; 1 Stor. Eq. sec. 331. Hence, says Justice STORY, if there be no proof of actual fraud or imposition, yet, if upon the whole circumstances, the contract appears to be grossly against conscience, or grossly unreasonable and oppressive, courts of Equity may, and will, grant relief; Nott v. Hill, 2 Vern. 167, 211; Cole v. Gibbons, 3 P. Williams, 290. Here, the court cannot but see that the contract in question is against conscience, and grossly unreasonable; Suttles v. Hay, 6 Ire. Eq. 124. Upon this point the case of Archer v. Hudson, 29, E. Ch. Rep. 360, is very strong. There, a Miss Kendray executed a note payable to a bank, as surety for her uncle, McDaniel, and for his benefit. She had been residing with her uncle but two months. The object of the note was fully explained to her by the agent of the bank, in procuring her signature, and she fully understood it. The Master of the Rolls says, "The relation between the *Page 164 
parties is undoubted. She, by signing the note for the benefit of her uncle, standing in loco parentis, without any consideration or advantage to herself, became subject to this liability. This is a transaction which, under ordinary circumstances, this Court will not allow." Again, the court say, "Nobody ever asserted that there could not be a pecuniary transaction between a parent and a child, the child being of age; but every body will affirm in this Court that, if there be a pecuniary transaction between a parent and a child just after the child attains twenty-one years of age, and prior to what may be called complete emancipation, without any benefit to the child the presumption is, that an undue influence has been exercised to procure that liability on the part of the child, and it is the duty and the business of the party who endeavors to maintain such a transaction, to show that the presumption is adequately rebutted." The answers in our case furnish the only evidence in the case, and from them we mainly derive the true character of this transaction. The two defendants were the uncles of the plaintiff. They were both present when the bond was executed, and the answer of Dr. Skinner shows plainly the influence he possessed over the plaintiff. He went to the house of Dr. Skinner an inebriate, and during the short time he sojourned there, the uncle succeeded, in some measure, in rescuing him from this degrading and inveterate habit, and if the Doctor has succeeded in his kind and benevolent effort, it will be worth to the plaintiff more than double the amount of his bond. But this is beside the present question, except in showing Dr. Skinner's influence over him. Ignorant and incapable of judging of his rights, he trusted to his friend and connection, Dr. Skinner, took his advice and information about the business, in preference to that of him who had lately been his guardian, his guide and director. For when, upon his return to the house of his uncle, he informed him that Mr. Haywood had told him that he (the Dr.) had not given him a correct view of the decree obtained by him and the other legatees, as appeared from the record of the suit, and the decree, the Doctor did not hesitate to tell him Mr. Haywood was *Page 165 
wrong, that he had examined the record and it was as he had represented it to him. He chose to trust to the opinion of Dr. Skinner in preference to that of his late guardian. All this shows the influence which the uncle had acquired over the nephew. But it turns out that Mr. Haywood was right, and Dr. Skinner was wrong. Under this ignorance of his rights and obligation, he executed the bond, distant from all his other friends and relatives with whom he might have counselled. Another fact disclosed by the answer is important: when, on his return to Dr. Skinner's, the plaintiff did not advert to the note which he had promised to give, until reminded of it by Dr. Skinner, he was then reluctant to execute it, but after sometime did so. We do not mean to say that any actual fraud was perpetrated by Dr. Skinner, or any intended. He, no doubt, believed what he stated. But where an individual pronounces a decree of a court of justice unjust, he ought to be very certain he is right. Here, however, the question is not one of direct and actual fraud, but of undue influence used to the injury of the plaintiff by the defendants; I say the defendants, for they were both present at the execution of the bond, and after its execution it was handed to Little, who immediately transferred it to Dr. Skinner, who gave him a credit for it on his account. We consider Dr. Skinner as standing throughout this transaction in the relation of a parent towards the plaintiff.
It was said in the argument that there was a moral obligation on the plaintiff to refund the money paid by Mr. Little to his guardian, because he had been injured to a large amount by being made to account for the value of lands improperly sold by him. We cannot perceive how that has worked an injury to him, for the slaves that had belonged to William P. Little had been sold to replace the landed fund. If he suffered by that transaction, he suffered in company with all the rest of the legatees. In truth, his suffering was contingent upon the amount of personal property Mrs. Anne Little might have to dispose of at her death.
Upon these grounds, we are of opinion that the injunction *Page 166 
ought to have been continued until the hearing. There is no error in the order appealed from.